## MARIE A. GRAEBER v. ANNA THERESA ANDERSON.[1]

May 16, 1952.

No. 35,738.

[1]Reported in 53 N. W. (2d) 642.

*Mordaunt & Mordaunt,* for appellant.

*Richards, Janes, Hoke, Montgomery & Cobb* and *Clark Mac-Gregor,* for respondent.

LORING, CHIEF JUSTICE.

This is an action for personal injuries. The trial court denied defendant's motion for a directed verdict, and the jury returned a verdict for plaintiff for $7,500. After defendant's motion for judgment notwithstanding the verdict was denied, judgment was entered, and defendant appeals therefrom. As error, she assigns only the court's denial of her motion for judgment notwithstanding the verdict.

The action arose after plaintiff was injured when she fell on stairs in defendant's apartment building. Plaintiff had moved into an apartment on the third floor in August 1936. Defendant had acquired title to the building at 3150 Girard avenue south in October 1941. The accident occurred September 20, 1948.

There were 21 apartments in the three-story building. The building had front and rear stairs, both inside the building. We are here concerned only with the rear stairs. These did not lead to a public sidewalk, but they did lead to an alley toward Hennepin avenue. The stairs had the same appearance from the basement to the roof, and they were used as much by the tenants as were the front stairs. There was a railing on the rear stairway on the right-hand side and a landing between the third floor and the roof. At the top of the rear stairs on the roof there was a cupola, which permitted entrance to the roof by means of an ordinary door. There was no landing at the head of the stairs next to the door leading to the roof. On the inside of that door, there was an ordinary hook, which could be opened readily, and an ordinary metal knob which controlled the latch. It was constructed as follows: A square rod extended through the door, and a knob was attached to each end, inside and out. At each end of the

rod, holes were drilled to enable the knobs to be fastened on by means of a screw. The knob assembly was an exhibit at the trial. An examination of it shows that the holes in the rod were so rusted or worn that the threads were all but obliterated. The door worked a little stiffly, so that, in order to close it, it was necessary to pull the knob firmly. There were laundry facilities in the basement, but there were no porches on the building. The roof was flat—of tar and gravel construction—and with a 15- to 16-inch wall at its edge. There were no facilities on the roof except for aerial poles. Deck chairs and tables were kept by some of the tenants on the landing between the third floor and the roof. A fair inference from the evidence is that they were taken to the roof for use by the tenants.

Plaintiff described the accident as follows:

"A. Went up on the roof to shake this little hand mop, and I was careful to close the door, and it closed very snugly, and as I closed this door I had my back to the stairs and my left hand I had on the knob. The railing is here, and when I pulled the door closed it came off in my hand and the next thing that I knew I was lying in this position on the landing. I had broken my glasses, and my feet were still on the first step, or the lowest step, and I was sprawled clear across the landing, cater corner, with the door knob there with me.

"Q. Just where was the door knob?

"A. I had it in my hand."

■ While defendant, in her statement of legal principles involved, includes a question whether plaintiff was guilty of contributory negligence as a matter of law, that question is not argued in her brief or on this appeal. Therefore, it is not necessary to consider it here.

■ Defendant contends (Appellant's brief, p. 7)—

"that the respondent [plaintiff] at the time of her accident was not at a place where she had a right to be or where she reason-

ably could be expected to go, and therefore, the accident was one in [*sic*] which the landlord could not reasonably have anticipated."

The answer to this question is dependent upon whether such tenants had the right to use the roof as appurtenant to their several tenements. Rosmo v. Amherst Holding Co. 235 Minn. 320, 324, 50 N. W. (2d) 698, 701. There is no evidence that such right was expressly given in the instant case, but there remains the question whether it was impliedly given.

Some six tenants and former tenants testified that they had used the roof at various times during defendant's ownership. Plaintiff testified as follows:

"A. I used it considerably. I used it as a little retreat, to go up there in the evening to get away from the world. I had a deck chair others had had. I took my clothes up there to air. I took my dust mop up there to shake it. There was no other place to shake a dust mop.

\* \* \* \* \*

"A. Well, during the summer months you could hardly go up there any Sunday or Saturday afternoon without somebody coming up there."

There were no stated restrictions and no warning signs against using the rear stairs or roof. On each floor there was a door between the stairs and the hallway to the apartments, but this door was kept open. A deputy building inspector from Minneapolis testified that the rear stairs and doorway met the requirements of the Minneapolis ordinance as to fire exits. The custodian testified as follows that he knew tenants were using the roof:

"Q. Did you ever hear of any of the tenants using the roof for any purpose?

"A. I didn't hear. The only thing I knew that there was somebody going up there.

"Q. And how did you know that there was somebody going up?

"A. Sometimes the door would be open.

"Q. Did you have occasion to go up there and chase some boys away at times?

"A. To what?

"Q. Chase boys.

"A. Yes, I did, children.

"Q. How did you know they were up there?

"A. Well, they would throw this gravel off onto the sidewalk.

"Q. And then what would you do?

"A. I would go up there and get them off."

Also, one witness testified that the custodian's wife had given the witness permission to use the roof.

As we said in the Rosmo case (235 Minn. 324, 326, 50 N. W. [2d] 701, 702):

"* * * Since the evidence did not disclose that such tenants were ever expressly excluded from using the alley * * * by their leasing agreements or otherwise, the trial court was of the opinion that the evidence permitted conflicting inferences as to whether plaintiff and the other upstairs tenants were impliedly entitled to use the alleyway in common with defendants' first-floor tenants. Accordingly, it submitted this question to the jury.

\* \* \* \* \*

"* * * we are of the opinion that the evidence reasonably supports the finding implicit in the jury's verdict that plaintiff was entitled to use the alley for the purpose she did at the time she was injured."

If we substitute "stairs and roof" for "alley" in the foregoing quotation, the language of this court would be applicable to the case at bar.

In Widing v. Penn Mut. L. Ins. Co. 95 Minn. 279, 282, 104 N. W. 239, 240, we said:

"These apartments were occupied by tenants for domestic purposes. The defendant landlord, who rented and received compensation for their use, was in duty bound to contemplate all ordinary and reasonable purposes for which they might be used;

and if, within such limitations, it was intended to restrict the occupancy of the porches by the tenants and their children, it was just and reasonable that such restrictions should be definitely made and brought home to such persons."[2]

The case of Fredenburg v. Baer, 89 Minn. 241, 243, 94 N. W. 683, 684, cited by defendant, is to be distinguished. In that case, we held:

"* * * Neither is there any evidence that the members of the societies were in the habit of using the closet with the knowledge or consent of defendants. There is some evidence to the effect that members of the societies had gone to the closet on several occasions, but nothing to show that the defendants had notice of any such custom or practice. To charge defendants with liability in this case, it should appear that the use of the closet was either expressly or impliedly granted to the members of the secret societies; otherwise no duty devolved upon defendants to provide such members with safe passage to and from it."

In the case at bar, defendant's custodian had knowledge that the roof was being used by the tenants.

In Akers v. C. St. P. M. & O. Ry. Co. 58 Minn. 540, 60 N. W. 669, there was no landlord-tenant relationship, and the use made by the trespassers could not be said to be ordinary and reasonable.

In Robinson v. Leighton, 122 Me. 309, 119 A. 809, there was no evidence that defendant or the janitor ever saw anyone on the fire escape. Without detailing them, the other cases cited by defendant as controlling are likewise distinguishable.

■ The next question raised by defendant is whether the evidence sustains the implicit finding of the jury that defendant, in the exercise of ordinary care, discovered or could have discovered the defect in the knob so as to prevent the injury to plaintiff. Immediately after the accident, the screw from the inner knob was missing. The custodian testified that the knob had not been re-

[2]See, also, McGinley v. Alliance Trust Co. 168 Mo. 257, 266, 66 S. W. 153, 155. Cf. Swenson v. Slawik, 236 Minn. 403, 53 N. W. (2d) 107.

paired in 16 years, but that some time prior to the accident he had inspected it as follows:

"A.   I just looked at it to see if it was tight, that is all.

"Q.   And what did you find?

"A.   It was all right, because I tried the door.

"Q.   And at that time did you observe whether or not that screw was in place?

"A.   It was in place.

"Q.   Did you observe whether or not it was tight?

"A.   Well, I didn't have no screw driver, I didn't try it.

"Q.   But—

"A.   It seemed to be tight on there.

\*   \*   \*   \*   \*

"Q.   (By Mr. Richards) Well, what do you mean?

"A.   Well, I closed the door and the knob didn't come off so the screw must have held it."

As stated above, the doorknob assembly, which was in evidence, shows that the holes into which the screw was intended to be inserted were so badly rusted and worn that the threads were almost completely obliterated. The applicable general rule, as stated in the Swenson case is as follows (236 Minn. 408, 53 N. W. [2d] 110):

"\*   \*   \*   when a landlord thus reserves control of a portion of his premises he is obligated to exercise ordinary care to keep the reserved property in a reasonably safe condition for those entitled and expected to use the same," and authorities there cited.

A landlord must take cognizance that continued use and wear and tear might cause deterioration of a substance. Anderson v. Winkle, 213 Minn. 77, 5 N. W. (2d) 355. And in Nubbe v. Hardy Continental Hotel System, 225 Minn. 496, 499, 31 N. W. (2d) 332, 334, where we held that there is a duty to inspect at reasonable intervals, we said:

"\*   \*   \*   Generally speaking, any defective condition in the premises caused by wear from prolonged and continual use is

brought into existence gradually and not suddenly, and although the landlord may not have had actual notice, it becomes a question of fact whether in the exercise of ordinary care he could have discovered the hazardous condition and the unreasonable risk involved therein in time to make repairs for the reasonable safety of others."

And, see, Williams v. Dickson, 122 Minn. 49, 141 N. W. 849.

In Circiello v. Levine, 316 Mass. 624, 625, 56 N. E. (2d) 17, where the defect in the premises was a protruding nail on a stairway, the court said:

"* * * the evidence did not warrant a finding that the nail had protruded for so long a time that the defendant in the exercise of reasonable care should have known of the existence of the protruding nail and remedied the defect."

Again the court said (316 Mass. 626, 56 N. E. [2d] 18):

"* * * The condition of a step in this particular might readily change in that period."

However, in the case at bar, the knob assembly is in such a state of disrepair that the jury could only have concluded that the defect causing the injury resulted from normal deterioration over an extended period of time. For a knob assembly located as this one was, we hold that periodic inspections were required; and from the state of the knob assembly the jury could find that an inspection, such as ordinary care required, would have revealed the defect. The evidence reasonably sustains the finding that defendant failed in the exercise of her duty to use ordinary care, and that such failure proximately caused plaintiff's injuries.

The judgment is affirmed.